UNITED STATES v. SMITH et al.

(District Court, D. Indiana. October 28, 1909.)

No. 6,922.

CRIMINAL LAW (§ 97*)—JURISDICTION—LOCALITY OF OFFENSE.

Defendants were owners and publishers of a daily newspaper at Indianapolis, Ind., which was also their place of residence. About 50 copies of such paper were deposited in the post office in Indianapolis and sent by mail to Washington, D. C., to subscribers and others ordering the same. Defendants maintained no office or agency in Washington, or the District of Columbia, for the circulation of the paper. *Held*, that an alleged criminal libel printed in such paper was published in Indiana only, and not in the District of Columbia, and that under the sixth constitutional amendment, which gives an accused the right to a trial by a jury of the state or district wherein the crime shall have been committed, a court in the District of Columbia was without jurisdiction to try defendants for such alleged libel.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 180, 190; Dec. Dig. § 97.*]

On application for a warrant of commitment for Delavan Smith and Charles R. Williams, and an order for their removal to the District of Columbia for trial on indictment for criminal libel. Defendants discharged.

Charles W. Miller, U. S. Atty., Stuart McNamara, Sp. Asst. U. S. Atty., and Clarence W. Nichols, Asst. U. S. Atty.

Ferdinand Winter and John D. Lindsay, for defendants.

Before ANDERSON, District Judge.

ANDERSON, District Judge (orally). This has been a very interesting discussion. It involves very interesting constitutional questions and questions which are always interesting to lawyers—questions of procedure. I suppose that, when you take into consideration the general interest taken in this case, the nature of the circumstances out of which it grew, the unusual features of the proceeding itself, and the important questions involved, I would be entirely justified in reserving my decision and taking time to put down on paper the con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

clusions that I have come to. But I have other things to do besides write, and in the immediate future my engagements are such as will preclude my taking time from other business to put down on paper carefully, as I would like to do, the views that I entertain upon these questions. So, at the risk of being somewhat misunderstood and incorrectly reported —with no reflection on the reporters, however—I will give my views upon this case at this time, and decide the question, so far as it is up to me to decide.

I carefully read over the brief which was handed to me yesterday morning by Mr. Lindsay, which, upon its face, purports to have been prepared by himself and Mr. Delancey Nicoll, and I was much impressed with the learning and the research shown in that brief, and, if it were necessary to a decision of the question before me, I would try to go into it further, and see whether or not my conclusions would accord with theirs. I do not feel now, however, that I am called upon to decide the questions presented in that brief, and for that reason I do not propose to go further into them at this time.

I was very strongly impressed this morning with Mr. Winter's argument on the proposition that these articles are not libelous. Up to that time it had not occurred to me that there was any question about their being libelous. But I am not so sure about it. I think, myself, that there is a good deal in the proposition that when articles charge people with swindling, or with thievery, and in the articles there is contained a statement of the facts upon which the charges are based, it does not necessarily follow that, because the words "thieving" and "swindling" are used, the articles are libelous per se. On two other questions that have been discussed I have more definite notions. I will take these up in their order, in the order in which they have been discussed and presented during this hearing.

In the first place, it is seriously contended, earnestly contended here, by the defendants' counsel, that these articles are conditionally privileged. When one undertakes to find a definition of privilege, or conditional privilege, it is very difficult to find one that is satisfactory. Under the head of "Malice," subhead "Privilege and Justification," American and English Encyclopædia of Law, I find this statement:

"The reconciliation of the two classes of cases mentioned above—those in which motive is material and those in which motive is not material—is to be sought in an extension of the concept of privilege, as understood in the law of libel, or in a coherent application of the idea of justification or excuse. The conception of privilege in the law of defamation is that an individual may with immunity commit an act which is a legal wrong, and, but for his privilege, would afford a good cause of action against him; all that is required, in order to raise the privilege and entitle him to protection, being that he shall act honestly in the discharge of some duty which the law recognizes, and shall not be prompted by a desire to injure the person who is affected by his act."

Let us go back a little. I have had occasion to say before that a newspaper has a certain duty to perform. It was well stated by a former President of the United States that it is the duty of a newspaper to print the news and tell the truth about it. It is the duty of a public newspaper, such as is owned and conducted by these defendants, to tell the people, its subscribers, its readers, the facts that it may find

out about public questions, or matters of public interest; and it is its duty and its right to draw inferences from the facts known—draw them for the people. I might just digress long enough to suggest that it is not everybody that can draw an inference.

Here was a great public question. There are many very peculiar circumstances about the history of this Panama Canal, or Panama Canal business. I do not wish to be understood as reflecting upon anybody, in office or out, in connection with that matter, except such persons as I may name in that way. The circumstances surrounding the revolution in Panama were unusual and peculiar. The people were interested in the construction of a canal. It was a matter of great public concern. It was much discussed. A large portion of the people favored the Nicaragua route. Another portion of those who were interested in it, officially or personally, preferred the Panama route. A committee was appointed to investigate the relative merits of the two routes. They investigated, and reported in favor of the Nicaragua route. Shortly afterwards—I do not now recall just how soon afterward—they changed to the Panama route. Up to the time of that change, as I gathered from the evidence, the lowest sum that had been suggested, at which the property of the Panama Canal Company could be procured, was something over $100,000,000. Then rather suddenly it became known that it could be procured for $40,000,000. There were a number of people who thought there was something not just exactly right about that transaction. And I will say for myself that I have a curiosity to know what the real truth was. Thereupon a committee of the United States Senate was appointed to investigate these matters—about the only way the matter could be investigated. The committee met. As stated in those articles, the man who knew all about it—I think that is the proper way to speak of Mr. Cromwell, who knew all about it—was called before the committee. Mr. Cromwell, upon certain questions being put to him, more or less pertinent, stood upon his privilege as an attorney and refused to answer. That was the state of the case, as shown by the evidence, when we adjourned last June.

At this session certain parts of the record showing the proceedings before the Senate Committee have been introduced by the government, and the impression made upon my mind from such parts as the government has seen fit to introduce is not more favorable to Mr. Cromwell's position than it was upon the former hearing. So far as the record has been read—and that is all the part that I have any acquaintance with—Mr. Cromwell stood upon his privilege whenever questions were asked, the answers to which would or might reflect upon him and his associates. But whenever a question was asked which gave him an opportunity to say something in their behalf, he ostentatiously thanked the examiner for the question and proceeded to answer. To my mind that gave just ground for suspicion. I am suspicious about it now. Subsequently, upon further examination in this matter, I suppose knowing that he would be examined about certain transactions in connection with it, he took the pains to get the privilege released by his then client; and the reasons given for varying his conduct in that instance from his conduct in the former instance, were about as unsub-

stantial as the reasons given upon the first instance for not answering then. So we have this situation: Here was a matter of great public interest, public concern. I was interested in it. You were interested in it. We were all interested in it. Here was a newspaper printing the news, or trying to. Here was this matter up for discussion, and I cannot say now—I am not willing to say—that the inferences are too strongly drawn. I am not approving of the inferences. I am simply saying that I am not able to say that they were too strongly drawn. Now, if that is the situation—and, as I understand the facts, that is the way it stands—the question is: Did these defendants, under the circumstances, act honestly in the discharge of this duty of which I have spoken, and which the law recognizes? Or were they prompted by a desire to injure the persons who were affected by their acts? If it were necessary to decide this case upon the question of privilege, the lack of malice, I would hesitate quite a while before I would conclude that it was my duty to send these people to Washington for trial.

But that is not all. This indictment charges these defendants with the commission of a crime in the District of Columbia. The sixth amendment to the Constitution of the United States provides:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state or district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

I will state what I find the evidence to be, and if I am mistaken about it in any way I will be glad to be corrected, because upon that I shall proceed to a conclusion. The Indianapolis News is owned, the evidence shows, by these defendants, is printed and published by them in the city of Indianapolis, in the state of Indiana, and at the time covered by this indictment it had a daily circulation of about 90,000 copies. All but about 2,000 of these copies were circulated and distributed in the state of Indiana. Some 400 or 500 were distributed in one or two adjoining states, and to the District of Columbia there were sent by mail, daily, about 50 copies, to subscribers and persons who ordered them sent there. The defendants have no agent, or bureau, or office, and maintain no agency, bureau, or office, in the city of Washington, or the District of Columbia, for the circulation of papers within that District. I think that is what the evidence in this case shows as to the way in which these papers are published and circulated. It is perfectly manifest that so far as this case is concerned the publication and the circulation of these papers anywhere except in the District of Columbia may be disregarded for the moment. So the question is: Do the defendants, when they print and publish 50 copies in the city of Indianapolis and deposit them in the United States post office in this building, to be transmitted by mail to 50 subscribers in Washington— do they publish those 50 papers in Washington? If they do, that court has jurisdiction of the offense. I will not go so far as to say that it has jurisdiction of the defendants. But, if they do not, then that court has neither jurisdiction of the offense nor of the defendants.

Let us look at it a little further. To my mind there is but one inference, one conclusion, that can be drawn. These statutes, which provide that where an offense is begun in one jurisdiction, in one

county, for example, and completed in another, or where an act is done in one county and the effect results in another, throw considerable light upon the question we have here. In other words, if a man stand near the edge of Marion county, this county, and within this county, and fires a shot at a man in an adjoining county, and kills him, were it not for the statute authorizing prosecution for the murder in the county in which the man dies, at common law he could be tried, convicted, and punished only in the county where he fired the shot. It is only because of the statute that he can be tried in either county, and if it were not for the statute there would be no jurisdiction whatever to try him in the adjoining county. That is illustrated by a number of cases.

But that is not this case. These defendants, as shown by the evidence, have not committed an act, a part of the doing of which was here and part of it in Washington. It is not that kind of a case. A United States statute, I might stop to say, which would make a case triable in a district different from the district where the act was committed, would be unconstitutional. Their acts are not shown by the evidence to have been acts part of which were committed in this district and part of them in Washington. It is not that kind of a case. Nor are they charged with doing an act here, the effect of which results in Washington. It is not that kind of a case. Everything that the evidence shows that the defendants did, they did in the district of Indiana, in the city of Indianapolis, in the county of Marion. I am not saying that if these defendants had an agent in Washington, to whom they sent for circulation copies of this paper, they might not be amenable to prosecution in Washington, ·if they could be arrested in Washington. We must distinguish that sort of a case from this.

It seems to me that I am compelled to take one of two views upon this question, and there is no middle ground between them. I cannot compromise it. When a newspaper owner or proprietor does what the evidence in this case shows these defendants did—composed, printed, and deposited in the mails for circulation these papers containing, for the purpose of this statement, libelous articles—either they are guilty here, and in every county and district and jurisdiction into which those papers go, or they are only guilty here. When these defendants put newspapers containing the alleged libelous articles into the post office here in Indianapolis, which went through the mails throughout the country, to various states, counties, and districts of the United States, either they committed a separate crime every time one of those papers went into another county, another state, or another district, or there was but one crime, and that crime was committed here.

In the case put during the argument, where a paper is deposited here in Indianapolis and circulates throughout the 92 counties of Indiana, when I asked counsel for the government whether it would be an offense in each county, he thought it would. And in the absence of the Indiana statute cited by the government's counsel, according to their theory, it would be. Then the question is: Suppose there was a conviction, say in Posey county; would that be a bar to a prosecution in Marion county? Counsel for the government think it would. I do not think it would, at all. Let us see if it would. The theory is that it

becomes a crime in each jurisdiction where it is circulated. If so, it must be a separate crime. If there is something in the circulation of it in the other county, or district, or jurisdiction, which makes it a crime there, it must be a separate crime. There is no escape from that. If it is a separate crime, a conviction or acquittal of it, of course, could not be pleaded in bar of a prosecution for another crime. I think that, as between those two views, the view that the offense, if any, was committed here is the more reasonable one, and the correct one. I am not saying, now, that there may not be circumstances where the publisher of a newspaper circulated throughout the country might be guilty of and prosecuted for more than one offense. I am speaking of the facts as shown by the evidence here—where people print a newspaper here, and deposit it in the post office here, for circulation throughout other states, territories, counties, and districts, there is one publication, and that is here. If that is true, then there was no publication, under the evidence, in Washington.

The discussion as to the hardship of taking a man away from his home to a distant place, to be tried, and the discussion pro and con as to the desirability of the District of Columbia and the city of Washington as a place for trial, was interesting. But those considerations, as suggested in one of the decisions of the Supreme Court, are not controlling, and I am not compelled to resort to anything of that kind to satisfy myself about what ought to be done here. To my mind that man has read the history of our institutions to little purpose who does not look with grave apprehension upon the possibility of the success of a proceeding such as this. If the history of liberty means anything, if constitutional guaranties are worth anything, this proceeding must fail.

If the prosecuting officers have the authority to select the tribunal, if there be more than one tribunal to select from, if the government has that power, and can drag citizens from distant states to the capital of the nation, there to be tried, then, as Judge Cooley says, this is a strange result of a revolution where one of the grievances complained of was the assertion of the right to send parties abroad for trial.

The defendants will be discharged.