## BOWLES, Price Adm'r, v. RICHARDS.
### Civil Action No. 2870.

District Court, D. Oregon.
Dec. 6, 1945.

W. A. Stockman and James A. Little, District Enforcement Attys., and J. Robert Patterson, Asst. U. S. Atty., all of Portland, Or., for plaintiff.

Verne Dusenbery, of Portland, Or. (Crum, Dusenbery & Martin, of Portland, Or.), for defendant.

McCOLLOCH, District Judge.

Defendant has several cottages at Seaside, Oregon. She says the cottages are "the nicest there." Because she had rented the cottages "the year round," OPA put her under a rental ceiling on that basis, although it did not impose ceilings on her summer competitors, who did not rent, or at least had not previously rented, during the winter months. As the result of this discriminatory setup, defendant testified that "shacks across the street" brought more during the summer months than she was able to obtain for her modern well furnished cottages.

Having had limited business experience, and being tied down by attention to a paralytic in her home, defendant did not take the course which the Supreme Court has declared to be due process, of (1) protesting to the Administrator, (2) if unsuccessful in her protest, filing a complaint in the Emergency Court of Appeals in Washington, (3) if unsuccessful in the Emergency Court, filing a petition for certiorari in the Supreme Court.

Instead, defendant "took the law into her own hands" and continued to charge at her old rates. These were shown, according to an OPA audit, to be higher during a certain period than the OPA order allowed, by the sum of $1917.36, and after the audit she was persuaded to agree to pay to the Treasury three times this amount as penalty, or $5752.08. At the time of making this agreement she paid $1000 on account, but since employing counsel she has declined to pay more. Hence this lawsuit for the unpaid balance.

Plaintiff rings the familiar changes that defendant may not at this time question the validity of the order which placed her at such a disadvantage with her competitors. That may be so. I do not find it necessary to pass on the point,[1] but I do want to emphasize, as I did in a similar case a few weeks ago, that the war which brought forth the Emergency Price Control Act has now ended, and that decisions rendered under wartime conditions are not necessarily binding at this time.

One need go no farther than this case to see plainly that the withdrawal of jurisdiction from all courts other than the one specially created to sit in Washington amounted, as a practical matter, to denying in most cases all judicial review of OPA regulations and orders. How could this woman have provided the means or even been physically able to betake herself and

[1] My figuring shows $111.80 possibly due to the Government on its theory of the case, but I am quite sure that close analysis of the accounts which I will want counsel to make will wipe out this debit.

witnesses to Washington to try out the justice of the order made in her case?[2] I do not hesitate to characterize Section 204(d) of the Price Control Act, 50 U.S.C.A.Appendix, § 924(d), which withdrew jurisdiction from all local courts,[3] as a legal hoax. The reason given for upholding the Section has been that it secured uniformity of interpretation of the regulations and orders. Administrator Chandler's report to the Judicial Conference of Senior Circuit Judges, September 25, 1945, 4 F.R.D. 488, shows that the Emergency Court of Appeals received appeals in ninety-three cases during the fiscal year 1944-1945, while twenty-eight thousand cases were filed in the Federal District Courts alone by OPA. What appreciable effect could ninety-three decisions by the Emergency Court have towards obtaining uniformity in twenty-eight thousand cases? Two of the E.C.A. judges disagreed in their own circuits as to the meaning of the word "validity" in Section 204(d).[4]

While of course not intended, this legislation resulted in denying judicial review as a practical matter to those most needing it, and it is hoped that never again will it be thought necessary to close the courts to the plain people on a matter of such importance.

There are many who trust that further consideration will be given by the Supreme Court to the question discussed, but not squarely presented, in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, that a criminal trial may be split, and held at different places, despite the language of Article III, Section 2, cl. 3 of the Constitution, that "The Trial of all Crimes * * * shall be held in the State where the said Crimes shall have been committed * * *." The earnest solicitude of the Supreme Court, as at present constituted, for the preservation of jury trial in full vigor, as understood by the makers of the Constitution, would seem to warrant reconsideration of this question.[5]

---

[2] Seaside was the farthest point west reached by Lewis and Clark.

[3] Except as provided in this section, no court, Federal, State or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule. Emergency Price Control Act of 1942, Sec. 204(d), 50 U.S.C.A.Appendix § 924(d).

In 9 Duke L.Rev. (Winter 1942) is to be found an interesting discussion by the gentlemen who I assume were the authors of the Price Control Act; pp. 54, 68, 69 et seq. and the notes to these pages give a brilliant preview of the legal arguments presented for and against Sec. 204(d) in the Supreme Court two years later, but the authors do not consider the Constitutional requirement as to place of trial, as the Court did not. N. 5, infra.

[4] Rottenberg v. United States, 1 Cir., 137 F.2d 850, 857; United States v. Pepper Bros., 3 Cir., 142 F.2d 340, 343.

[5] The opinion of the court did not discuss Art. III, Sec. 2.

As to place of trial, see United States v. Johnson, 1944, 323 U.S. 273, 65 S.Ct. 249. Cf. Labedz v. Kramer, D.C.Or. 1944, 55 F.Supp. 25.

Quoted from 2 Story on the Constitution, 5th Ed., Sec. 1781: "It is observable, that the trial of all crimes is not only to be by jury, but to be held in the State, where they are committed. The object of this clause is, to secure the party accused from being dragged to a trial in some distant State, far away from his friends, and witnesses, and neighborhood; and

thus subjected to the verdict of mere strangers, who may feel no common sympathy, or who may even cherish animosities, or prejudices, against him. Besides this, a trial in a distant State or Territory might subject the party to the most oppressive expenses, or perhaps even to the inability of procuring the proper witnesses to establish his innocence. There is little danger, indeed, that Congress would ever exert their power in so oppressive and unjustifiable a manner. But upon a subject, so vital to the security of the citizen, it was fit to leave as little as possible to mere discretion. By the common law, the trial of all crimes is required to be in the county, where they are committed. Nay, it originally carried its jealousy still farther, and required, that the jury itself should come from the vicinage of the place, where the crime was alleged to be committed."

---

" * * *: and whereas, it has lately been resolved in Parliament, that by force of a Statute, made in the thirty-fifth year of the reign of King Henry the VIII, Colonists may be transported to England, and tried there, upon accusations for treasons and misprisions, or concealments, of treasons committed in the Colonies, and by a late Statute, such trials have been directed in cases therein mentioned:

"And whereas, in the last session of Parliament, three Statutes were made; * * * All which Statutes are impolitic, unjust, and cruel, as well as unconsti-

tutional, and most dangerous and destructive of American rights: * * *

"The good People of the several Colonies * * * declare

"That the inhabitants of the English Colonies in North America, by the immutable laws of Nature, the principles of the English Constitution, and the several Charters or Compacts, have the following Rights.

* * * * * * * *

"Resolved, N.C.D. 5. That the respective Colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law."

"Declaration of Rights, of the Continental Congress, October 14, 1774.

* * * * * * * *

"He has combined, with others, to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his assent to their acts of pretended legislation:

* * * * . * * * *

"For transporting us beyond seas, to be tried for pretended offences:"

Declaration of Independence.

See In the Matter of Charles A. Dana, 1873, Fed.Cas.No.3,554, 7 Ben. 1, where Judge Blatchford refused to remove the editor in chief of the New York Sun to Washington for trial for criminal libel, and Judge Cooley's comment on the same cited by Judge Anderson in United States v. Smith, D.C.1909, 173 F. 227, 232:

"If the prosecuting officers have the authority to select the tribunal, if there be more than one tribunal to select from, if the government has that power, and can drag citizens from distant states to the capital of the nation, there to be tried, then, as Judge Cooley says, this is a strange result of a revolution where one of the grievances complained of was the assertion of the right to send parties abroad for trial." (To be found in Cooley's "Constitutional Limitations", 7th Ed., pp. 459 and 460 and Notes.)

In the Smith case Judge Anderson declined to allow removal of the editor of the Indianapolis News to answer a political indictment that had been returned in Washington, D. C., on account of criticism of the location of the Panama Canal in the administration of Theodore Roosevelt. Judge Anderson was belabored by law school liberals ten years later for granting a labor injunction, but any balanced estimate of his career would give high rating to the superb defense of Constitutional principle in the Smith case. I gather from the dates disclosed in his biographical sketch that Judge Anderson had been appointed by President Theodore Roosevelt.

See for place of trial in criminal cases a recent note in 46 Col.L.Rev. 136 (Jan. 1946), and particularly the Colonial background to Art. III, Sec. 2, U.S.Constit. in 43 Mich.L.Rev. 63.

There is a discussion of the vicinage in Guiteau's case, United States v. Guiteau, 1882, 1 Mackey's Reports, 498, 531 et seq., 47 Am.Rep. 247.