## NEYLAND v. HOME PATTERN CO., Inc., et al.

### No. 403.

Circuit Court of Appeals, Second Circuit.

May 8, 1933.

Frank, Weil & Strouse, of New York City (Samuel F. Frank and Arthur W. Weil, both of New York City, of counsel), for appellant.

Carter, Ledyard & Milburn, of New York City (J. M. R. Lyeth, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Neyland sued the defendant at law in the state court for damages under section 51 of the New York Civil Rights Law (Consol. Laws N. Y. c. 6), as amended by Laws 1921 c. 501, which forbids any one to use another's name or portrait for "advertising" or "purposes of trade." The defendant removed the cause to the federal court and the action was tried to a jury. At the conclusion of the evidence the judge took a special verdict on a limited issue of fact, and directed a general verdict for the defendant. The plaintiff appealed. The facts, which were undisputed except as found by the special verdict, were as follows: Neyland was a painter of reputation, especially of ships. One of his paintings was of a whaling brig, under sail in a snowstorm, full and by, which he signed, and which became known as "The Huntress of the North." This was photographically reproduced, without the signature, by a magazine, known as "Arts and Decoration," which used it, along with others of Neyland's paintings, in a copyrighted article describing his work, and of course using his name. To all this he consented, though not in writing, and of it he does not complain. The defendant published magazines of various sorts, among others one known as "The Ladies Home Journal." In an issue of this appeared several maritime designs for embroidered sofa and pillow cushions, among which was a very crude reproduction taken from "Arts and Decoration," of Neyland's painting of the brig, with the snow left out and a rough circle in the sky for the moon. At one side appeared this legend: "The C. W. Morgan, on the pillow to the left, comes straight from the painting by Harry Neyland." In the text was the following: "In the C. W. Morgan, the square-rigged bark" (sic) "at top of page, vertical long and short stitches are used for foremast and mainsails, and long, slanting satin stitches for jibs. Spars, masts, top of hull and white-caps are in satin stitch; lower part and sides of hull, jib-boom, rugging waves and moon are outlined." At the bottom of the page appeared the following: "Patterns may be secured from stores selling 'Ladies Home Journal,' or by mail from Home Pattern Co., 18 East 18th St., N. Y. C. Boats Transfers 25 cents; Dresses 45 cents." The other defendant, Home Pattern Company, made patterns corresponding to those appearing in the Ladies Home Journal, which were kept on sale at various places for the benefit of readers of that magazine at the prices stated above. Among these was the pattern of Neyland's painting, though it does not definitely appear whether any were sold. The action was first, for infringement of Neyland's right of artistic property in the painting, and, second, for the use of his name under section 51 of the N. Y. Civil Rights Law (Consol. Laws N. Y. c. 6), as amended by Laws 1921, c. 501 which is copied in the margin.[1] Upon the ar-

---

[1] "§ 51. *Action for injunction and for damages.*— Any person whose name, portrait or picture is used

gument and in the brief the appellant does not press the cause of action for infringement of his artistic property, and we do not understand that it is before us.

Upon the second cause of action two questions arise; first, whether the defendant used Neyland's name "for purposes of trade"; second, if so, whether that use was excused by the last sentence of section 51. As to the first, we shall assume without deciding that merely to publish a reproduction of the painting, coupled with Neyland's name, would not violate the right conferred by section 51, though it might be an infringement of his artistic property. However, to sell patterns of his painting was plainly "trade," and if his name was used to further such sales, that use was either "advertising" or an incident to "trade" in the patterns. To escape the defendant must bring itself within the excuse, granted upon the statute by the amendment of 1921 (Laws 1921, c. 501); that is, the passage in the last sentence, following the semicolon.

The pertinent words are these: "Nothing contained in this act shall be so construed as to prevent any person * * * from using the name * * * of any * * * artist in connection with his * * * artistic productions which he has sold or disposed of with such name * * * used in connection therewith." The second condition was fulfilled; Neyland used his name "in connection" with the painting, for he signed it. We may assume that if he had sold it, the purchaser, and those who succeeded him, could

have advertised it as a genuine Neyland and sold it as such, or made copies of it and similarly sold these. Had Neyland wished to preserve his anonymity, he must have abstained from affixing his name to his "production"; that at least was a use of it "in connection therewith." No doubt there are other sufficient uses; for example, he might have tried to enhance its sale value by its attribution to himself. But the other condition does not seem to us to have been met; he had not "sold," and he had not "disposed of" the painting. To construe that phrase we look to what just precedes in the amendment, which refers to a "manufacturer or dealer," and to the "goods, wares and merchandise manufactured, produced or dealt in by him." An implied license arises to use the name to sell the goods, if they have been "sold or disposed of," and if the name has been previously "used in connection" with them by the maker. In such cases the meaning is plainer; it is that when a man labels his wares with his name, or has used it to sell them, the buyer and the buyer's buyers may sell them as the maker's, and otherwise make use of the name to trade in them. Steinway may not object that his pianos are sold and advertised as Steinways; Gillette, that the wrapping bears his unforgettable effigy; Ford, that his cars are called by that momentous name. Just how far the maker need associate his name with the sale we need not say; "therewith" may be more extensive than "with the sale or disposition thereof." But the critical point is that the licensee is the buyer, or the person to whom the goods are otherwise disposed of; and their successors, at least in possession; if one would get leave without coming within either class, it must be written.

Similarly of "literary, musical or artistic" property. To exist at all, such property must be incorporated in a chattel, and the situations become parallel. The license goes to the person to whom the chattel is "sold or disposed of," and to those who succeed him. It is an incident, if not of title to, at least of possession of, the "production" itself. The man who gets a book written under the author's name, or a musical score, or a painting or statue or design, to which he has attached his name, directly or not, may sell it by that name; we may assume that he may reproduce it and sell the copies as the author's. But one who merely copies it, even with leave, does not obtain the "production"; he is indeed free to use the name except for "advertising" or "trade," but those uses he must eschew. The author who allows him to copy it

within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages. But nothing contained in this act shall be so construed as to prevent any person, firm or corporation, practicing the profession of photography, from exhibiting in or about his or its establishment specimens of the work of such establishment, unless the same is continued by such person, firm or corporation after written notice objecting thereto has been given by the person portrayed; and nothing contained in this act shall be so construed as to prevent any person, firm or corporation from using the name, portrait or picture of any manufacturer or dealer in connection with the goods, wares and merchandise manufactured, produced or dealt in by him which he has sold or disposed of with such name, portrait or picture used in connection therewith; or from using the name, portrait or picture of any author, composer or artist in connection with his literary, musical or artistic productions which he has sold or disposed of with such name, portrait or picture used in connection therewith."

does not license him to hawk his name; to do that he must get the chattel, or a written consent. Such appears to us to be the import of the amendment.

Possibly it is not necessary to go so far. Even were oral consent enough, Neyland gave none to the defendant; at most he allowed "Arts and Decoration" to use his name in the magazine. That license did not cover the defendant; indeed it did not include "advertising" or "trade" at all, even though the magazine was sold for money. The statute does not prohibit publication of a man's doings, whatever they may be. D'Altomonte v. N. Y. Herald Co., 208 N. Y. 596, 102 N. E. 1101. He must look to the law of libel. But the defendant's use was within the statute, not being so confined. However, we prefer to rest our decision on the first point.

Judgment reversed; new trial ordered.