### SIDIS v. F–R PUB. CORPORATION.
#### No. 400.

Circuit Court of Appeals, Second Circuit.
July 22, 1940.

CLARK, Circuit Judge, dissenting in part.

Edwin J. Lukas, of New York City (Sapinsley, Lukas & Santangelo and Louis Okin, all of New York City, on the brief), for plaintiff-appellant.

Alexander Lindey, of New York City (Greenbaum, Wolff & Ernst and Harriet F. Pilpel, all of New York City, on the brief), for defendant-appellee.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

CLARK, Circuit Judge.

William James Sidis was the unwilling subject of a brief biographical sketch and cartoon printed in The New Yorker weekly magazine for August 14, 1937. Further references were made to him in the issue of December 25, 1937, and in a newspaper advertisement announcing the August 14 issue. He brought an action in the district court against the publisher, F-R Publishing Corporation. His complaint stated three "causes of action": The first alleged violation of his right of privacy as that right is recognized in California, Georgia, Kansas, Kentucky, and Missouri; the second charged infringement of the rights afforded him under §§ 50 and 51 of the N. Y. Civil Rights Law (Consol.Laws, c. 6); the third claimed malicious libel under the laws of Delaware, Florida, Illinois, Maine, Massachusetts, Nebraska, New Hampshire, Pennsylvania, and Rhode Island. Defendant's motion to dismiss the first two "causes of action" was granted, and plaintiff has filed an appeal from the order of dismissal. Since a majority of this court believe that order appealable, for reasons referred to below, we may consider the merits of the case.

William James Sidis was a famous child prodigy in 1910. His name and prowess were well known to newspaper readers of the period. At the age of eleven, he lectured to distinguished mathematicians on the subject of Four-Dimensional Bodies. When he was sixteen, he was graduated from Harvard College, amid considerable public attention. Since then, his name has appeared in the press only sporadically, and he has sought to live as unobtrusively as possible. Until the articles objected to appeared in The New Yorker, he had apparently succeeded in his endeavor to avoid the public gaze.

Among The New Yorker's features are brief biographical sketches of current and past personalities. In the latter department, which appears haphazardly under the title of "Where Are They Now?" the article on Sidis was printed with a subtitle "April Fool." The author describes his subject's early accomplishments in mathematics and the wide-spread attention he received, then recounts his general breakdown and the revulsion which Sidis thereafter felt for his former life of fame and study. The unfortunate prodigy is traced over the years that followed, through his attempts to conceal his identity, through his chosen career as an insignificant clerk who would not need to employ unusual mathematical talents, and through the bizarre ways in which his genius flowered, as in his enthusiasm for collecting streetcar transfers and in his proficiency with an adding machine. The article closes with an account of an interview with Sidis at his present lodgings, "a hall bedroom of Boston's shabby south end." The untidiness of his room, his curious laugh, his manner of speech, and other personal habits are commented upon at length, as is his present interest in the lore of the Okamakammessett Indians. The subtitle is explained by the closing sentence, quoting Sidis as saying "with a grin" that it was strange, "but, you know, I was born on April Fool's Day." Accompanying the biography is a small cartoon showing the genius of eleven years lecturing to a group of astounded professors.

It is not contended that any of the matter printed is untrue. Nor is the manner of the author unfriendly; Sidis today is described as having "a certain childlike charm." But the article is merciless in its dissection of intimate details of its subject's personal life, and this in company with elaborate accounts of Sidis' passion for privacy and the pitiable lengths to which he has gone in order to avoid public scrutiny. The work possesses great reader interest, for it is both amusing and instructive; but it may be fairly described as a ruthless exposure of a once public character, who has since sought and has

now been deprived of the seclusion of private life.

The article of December 25, 1937, was a biographical sketch of another former child prodigy, in the course of which William James Sidis and the recent account of him were mentioned. The advertisement published in the New York World-Telegram of August 13, 1937, read: "Out Today. Harvard Prodigy. Biography of the man who astonished Harvard at age 11. Where are they now? by J. L. Manley. Page 22. The New Yorker."

The complaint contains a general allegation, repeated for all the claims, of publication by the defendant of The New Yorker, "a weekly magazine of wide circulation throughout the United States." Then each separate "cause" contains an allegation that the defendant publicly circulated the articles or caused them to be circulated in the particular states upon whose law that cause is assumed to be founded. Circulation of the New York World-Telegram advertisement is, however, alleged only with respect to the second "cause," for asserted violation of New York law.

1. Under the first "cause of action" we are asked to declare that this exposure transgresses upon plaintiff's right of privacy, as recognized in California, Georgia, Kansas, Kentucky, and Missouri.[1] Each of these states except California grants to the individual a common law right, and California a constitutional right,[2] to be let alone to a certain extent. The decisions have been carefully analyzed by the court below,[3] and we need not examine them further. None of the cited rulings goes so far as to prevent a newspaper or magazine from publishing the truth about a person, however intimate, revealing, or harmful the truth may be. Nor are there any decided cases that confer such a privilege upon the press. Under the mandate of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we face the unenviable duty of determining the law of five states on a broad and vital public issue which the courts of those states have not even discussed.[4]

All comment upon the right of privacy must stem from the famous article by Warren and Brandeis on The Right of Privacy in 4 Harv.L.Rev. 193. The learned authors of that paper were convinced that some limits ought to be imposed upon the privilege of newspapers to publish truthful items of a personal nature. "The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. * * * The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere

---

[1] Green, The Right of Privacy, 27 Ill. L.Rev. 237, 248; Ragland, The Right of Privacy, 17 Ky.L.J. 85, 110–113; Moreland, The Right of Privacy Today, 19 Ky. L.J. 101; Lisle, The Right of Privacy (A Contra View), 19 Ky.L.J. 137; Larremore, The Law of Privacy, 12 Col.L. Rev. 693; Harper and McNeely, (1938) Wis.L.Rev. 426, 458; 5 Mo.L.Rev. 343.

[2] Melvin v. Reid, 112 Cal.App. 285, 297 P. 91. But cf. Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491.

[3] Judge Goddard's decision is reported in 34 F.Supp. 19. The cases he reviewed are Melvin v. Reid, supra note 2; Pavesich v. New England L. I. Co., 122 Ga. 190, 50 S.E. 68, 69 L.R.A. 101, 106 Am.St.Rep. 104, 2 Ann.Cas. 561; Bazemore v. Savannah Hospital, 171 Ga. 257, 155 S.E. 194; Goodyear Tire & Rubber Co. v. Vandergriff, 52 Ga.App. 662, 184 S.E. 452; Kunz v. Allen, 102 Kan. 883, 172 P. 532, L.R.A.1918D, 1151; Brents v. Morgan, 221 Ky. 765, 299 S.W. 967, 55 A.L.R. 964; Douglas v. Stokes, 149 Ky. 506, 149 S.W. 849, 42 L.R.A.,N.S., 386, Ann.Cas.1914B, 374; Foster-Milburn Co. v. Chinn, 134 Ky. 424, 120 S. W. 364, 34 L.R.A.,N.S., 1137, 135 Am. St.Rep. 417; Jones v. Herald Post Co., 230 Ky. 227, 18 S.W.2d 972; Rhodes v. Graham, 238 Ky. 225, 37 S.W.2d 46; Munden v. Harris, 153 Mo.App. 652, 134 S.W. 1076. See also Metter v. Los Angeles Examiner, supra note 2.

[4] The cases most nearly in point are Jones v. Herald Post Co., supra note 3, and Metter v. Los Angeles Examiner, supra note 2. But both these decisions involved news events of great current interest to the community.

bodily injury." Warren and Brandeis, supra at page 196.

Warren and Brandeis realized that the interest of the individual in privacy must inevitably conflict with the interest of the public in news. Certain public figures, they conceded, such as holders of public office, must sacrifice their privacy and expose at least part of their lives to public scrutiny as the price of the powers they attain. But even public figures were not to be stripped bare. "In general, then, the matters of which the publication should be repressed may be described as those which concern the private life, habits, acts, and relations of an individual, and have no legitimate connection with his fitness for a public office. * * * Some things all men alike are entitled to keep from popular curiosity, whether in public life or not, while others are only private because the persons concerned have not assumed a position which makes their doings legitimate matters of public investigation." Warren and Brandeis, supra at page 216.

It must be conceded that under the strict standards suggested by these authors plaintiff's right of privacy has been invaded. Sidis today is neither politician, public administrator, nor statesman. Even if he were, some of the personal details revealed were of the sort that Warren and Brandeis believed "all men alike are entitled to keep from popular curiosity."

■ But despite eminent opinion to the contrary,[5] we are not yet disposed to afford to all of the intimate details of private life an absolute immunity from the prying of the press. Everyone will agree that at some point the public interest in obtaining information becomes dominant over the individual's desire for privacy. Warren and Brandeis were willing to lift the veil somewhat in the case of public officers. We would go further, though we are not yet prepared to say how far. At least we would permit limited scrutiny of the "private" life of any person who has achieved, or has had thrust upon him, the questionable and indefinable status of a "public figure." See Restatement, Torts, § 867, comments c and d; Corliss v. E. W. Walker Co., C.C.Mass., 57 F. 434, 31 L.R.A. 283; Id., C.C., 64 F. 280, 31 L.R. A. 283; Jeffries v. New York Evening

Journal Pub. Co., 67 Misc. 570, 124 N.Y.S. 780; Jones v. Herald Post Co., supra; Metter v. Los Angeles Examiner, supra; cf. Hillman v. Star Pub. Co., 64 Wash. 691, 117 P. 594, 35 L.R.A., N.S. 595, criticized in 10 Mich.L.Rev. 335.

■ William James Sidis was once a public figure. As a child prodigy, he excited both admiration and curiosity. Of him great deeds were expected. In 1910, he was a person about whom the newspapers might display a legitimate intellectual interest, in the sense meant by Warren and Brandeis, as distinguished from a trivial and unseemly curiosity. But the precise motives of the press we regard as unimportant. And even if Sidis had loathed public attention at that time, we think his uncommon achievements and personality would have made the attention permissible. Since then Sidis has cloaked himself in obscurity, but his subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern. The article in The New Yorker sketched the life of an unusual personality, and it possessed considerable popular news interest.

We express no comment on whether or not the news worthiness of the matter printed will always constitute a complete defense. Revelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's notions of decency. But when focused upon public characters, truthful comments upon dress, speech, habits, and the ordinary aspects of personality will usually not transgress this line. Regrettably or not, the misfortunes and frailties of neighbors and "public figures" are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day.

Plaintiff in his first "cause of action" charged actual malice in the publication, and now claims that an order of dismissal was improper in the face of such an allegation. We cannot agree. If plaintiff's right of privacy was not invaded by the article, the existence of actual malice in

* 5 Warren and Brandeis, supra at page 216; Pound, Interests of Personality, 28 Harv.L.Rev. 343, 363; Green, supra note 1, at page 248; Ragland, supra note 1, at pages 110-113; Larremore, supra note 1, at page 698.

its publication would not change that result. Unless made so by statute, a truthful and therefore non-libelous statement will not become libelous when uttered maliciously. Restatement, Torts, § 582, comment a; George, The Count Joannes v. Jennings, 4 Hun, N.Y., 66, 6 Thomp. & C. 138; Baskett v. Crossfield, 190 Ky. 751, 228 S.W. 673; Cook v. Pulitzer Pub. Co., 241 Mo. 326, 145 S.W. 480, 490.[6] A similar rule should prevail on invasions of the right of privacy. "Personal ill-will is not an ingredient of the offence, any more than in an ordinary case of trespass to person or to property." Warren and Brandeis, supra at page 218. Nor does the malice give rise to an independent wrong based on an intentional invasion of the plaintiff's interest in mental and emotional tranquility. This interest, however real, is one not yet protected by the law. Restatement, Torts, § 46, comment c.

If the article appearing in the issue of August 14, 1937, does not furnish grounds for action, then it is clear that the brief and incidental reference to it contained in the article of December 25, 1937, is not actionable.

2. The second "cause of action" charged invasion of the rights conferred on plaintiff by §§ 50 and 51 of the N. Y. Civil Rights Law. Section 50 states that "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." Section 51 gives the injured person the right to an injunction and to damages.

■ ■ Before passage of this statute, it had been held that no common law right of privacy existed in New York. Roberson v. Rochester Folding Box Co., 171 N. Y. 538, 64 N.E. 442, 59 L.R.A. 478, 89 Am.St.Rep. 828. Any liability imposed upon defendant must therefore be derived solely from the statute, and not from general considerations as to the right of the individual to prevent publication of the intimate details of his private life. The statute forbids the use of a name or picture only when employed "for advertising purposes, or for the purposes of trade." In this context, it is clear that "for the purposes of trade" does not contemplate the publication of a newspaper, magazine, or book which imparts truthful news or other factual information to the public. Though a publisher sells a commodity, and expects to profit from the sale of his product, he is immune from the interdict of §§ 50 and 51 so long as he confines himself to the unembroidered dissemination of facts.[7] Publishers and motion picture producers have occasionally been held to transgress the statute in New York, but in each case the factual presentation was embellished by some degree of fictionalization. See, for example, Blumenthal v. Picture Classics, Inc., 235 App. Div. 570, 257 N.Y.S. 800, affirmed without opinion 261 N.Y. 504, 185 N.E. 713. The cases are collected and the distinction between fact and fiction explained as vital in Sarat Lahiri v. Daily Mirror, 162 Misc. 776, 295 N.Y.S. 382. See also Neyland v. Home Pattern Co., 2 Cir., 65 F.2d 363; Sweenek v. Pathé News, Inc., D.C.E.D. N.Y., 16 F.Supp. 746. The New Yorker articles limit themselves to the unvarnished, unfictionalized truth.[8]

■ The case as to the newspaper advertisement announcing the August 14 article is somewhat different, for it was undoubtedly inserted in the World-Telegram "for advertising purposes." But since it was to advertise the article on Sidis, and the article itself was unobjectionable, the advertisement shares the privilege enjoyed by the article. Humiston v. Universal Film Mfg. Co., 189 App.Div. 467, 476, 178 N.Y.S. 752. Besides, the adver-

---

[6] In several states the rule is to the contrary, and the basis of plaintiff's third cause of action is the doctrine of "malicious libel" recognized in those jurisdictions. But that doctrine does not appear to be recognized by the law of the five states concerned in the first cause of action.

[7] To the very limited extent that Martin v. New Metropolitan Fiction, Inc., 139 Misc. 290, 248 N.Y.S. 359, affirmed without opinion 234 App.Div. 904, 254 N.Y.S. 1015, may be construed to the contrary, we prefer to rely on the equally respectable authority of Sarat Lahiri v. Daily Mirror, infra.

[8] In this respect they differ also from the libelous publications considered in cases such as Triggs v. Sun Printing & Pub. Ass'n, 179 N.Y. 144, 71 N.E. 739, 66 L.R.A. 612, 103 Am.St.Rep. 841, 1 Ann.Cas. 326; and Burton v. Crowell Pub. Co., 2 Cir., 82 F.2d 154, which are cited by plaintiff as showing a refusal by the courts to sanction "journalistic license."

tisement, quoted above, did not use the "name, portrait or picture" of the plaintiff.

3. As an alternative contention, defendant asserts that publication occurred solely in New York and that only New York law can apply. In the view we have taken of the case, decision of this issue is not necessary; and in the light of the allegations of the complaint, a proper consideration of it could not well be had upon this pleading alone. Cf. Banks v. King Features Syndicate, D.C. S.D. N.Y., 30 F.Supp. 352.

■ 4. The question as to the appealability of the dismissal order arises because the third "cause of action," alleging malicious libel as made actionable under the laws of nine states, remains standing. No motion to dismiss was made as to it, but defendant obtained an order below postponing the time for answering this cause until the disposition of the motion for dismissal, asserting that the contents of its answer would depend to a large extent upon such disposition. A majority of this court find the facts necessary to support the third claim to be sufficiently different from those relied on to support the other claims so as to make the dismissal order appealable under Collins v. Metro-Goldwyn Pictures Corp., 2 Cir., 106 F.2d 83, and Federal Rules of Civil Procedure, Rule 54(b), 28 U.S.C.A. following section 723c. They point to such matters as the different proof of circulation of the magazine required, the necessity of showing malice for the last claim, the necessity of showing use in advertising or for purposes of trade under the second claim. They also point to the obvious convenience to the parties of our action in view of the present posture of the case. This conclusion therefore stands as the judgment of the court herein.

The writer of this opinion dissents from that view. Recognizing the convenience to the parties of the action taken, as well as the fact that the extent of a single cause or claim cannot be a matter of precise rule and must depend to a considerable exent upon ad hoc circumstances, I nevertheless feel that here was but a single transaction or occurrence, and the asserted distinctions between the claims are only differing theories of legal recovery. Hence, as I pointed out in Collins v. Metro-Goldwyn Pictures Corp., supra, and in Atwater v. North American Coal Corp., 2 Cir., 111 F.2d 125, there is as yet no final order in the case. See also Bowles v. Commercial Cas. Ins. Co., 4 Cir., 107 F.2d 169; Karl Kiefer Mach. Co. v. United States Bottlers Machinery Co., 7 Cir., 108 F.2d 469; 5 Mo.L.Rev. 110; 26 Va.L.Rev. 223; 49 Yale L.J. 1476.[9] And there is danger that such a holding as the present may disturb well settled rules both of res judicata and against splitting causes, thus throwing open the door to successive suits upon what, after all, is but one injury and one wrong. For here a judgment against recovery for violation of privacy should be res judicata against later claims of libel, Binns v. Vitagraph Co., 210 N.Y. 51, 59, 103 N.E. 1108, L.R.A.1915C, 839, Ann. Cas.1915B, 1024, or other privacy rights. United States v. Smith, D.C.Ind., 173 F. 227; Wolfson v. Syracuse Newspapers, Inc., 254 App.Div. 211, 212, 4 N.Y.S.2d 640, affirmed 279 N.Y. 716, 18 N.E.2d 676; Fried, Mendelson & Co. v. Edmund Halstead, Ltd., 203 App.Div. 113, 115, 196 N. Y.S. 285; Cook v. Conners, 215 N.Y. 175, 179, 109 N.E. 78, L.R.A.1916A, 1074, Ann. Cas.1917A, 248.

Affirmed.

---

[9] Possibly, as the law review writers suggest, increased appealability where the court finds it convenient may be desirable, but the law under which we operate does not so provide. Cf. Crick, The Final Judgment as a Basis for Appeal, 41 Yale L.J. 539.