SERGE KOUSSEVITZKY, Plaintiff, *v.* ALLEN, TOWNE & HEATH, INC., et al., Defendants.

Supreme Court, Special Term, New York County, March 4, 1947.

*Henry Root Stern, George L. Trumbull* and *John B. Brecken-ridge* for plaintiff.

*Morris L. Ernst, Leo Rosen, Harriet F. Pilpel, Wirth H. Koenig* and *Hyman Chipkin* for Allen, Towne & Heath, Inc., and another, defendants.

SHIENTAG, J.   Plaintiff, an eminent conductor of a world-renowned symphony orchestra, and an outstanding international figure in the field of music, who earns substantial sums of money from his various musical activities, seeks to enjoin the publication of a book purporting to be his biography, for which he had refused authorization.   The book contains pictures

of him which he says are used without his permission, and it has the usual puffing or advertising cover jacket.

Dr. Koussevitzky, the plaintiff, charges that the book "falsely and wrongfully portrays his life and musical career" and that it contains much objectionable, untruthful, fictitious and defamatory matter which he more or less particularizes in his complaint. For his right to injunctive relief he relies mainly on what he claims to be a violation of the "Right of Privacy" afforded by sections 50 and 51 of the Civil Rights Law of New York. The precise question which he thus raises has never been decided in this State. He contends further that in any event he is, under the circumstances of this case, entitled to an injunction *pendente lite* to restrain the publication of a threatened libel.

In 1890, the subject of the right of privacy was considered in a brilliant essay which has become a classic in the law (Warren and Brandeis on The Right to Privacy, 4 Harv. L. Rev. 193). In 1902, the question was presented to the Court of Appeals in *Roberson* v. *Rochester Folding Box Co.* (171 N. Y. 538). By a divided bench of four to three, it was held that there was no common-law right of privacy in this State. Recovery was denied to a woman whose photograph was used by the defendant without her authorization, in advertising its brand of flour.

The following year, the Legislature enacted sections 50 and 51 of the Civil Rights Law, the pertinent parts of which are set forth in the footnote.*

This statute sought to protect the sentiments, thoughts and feelings of an individual by embodying "a legal recognition — limited in scope to be sure, but a clearly expressed recognition

---

* Article 5. Right of Privacy. "§ 50. *Right of Privacy.*— A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.

"§ 51. *Action for injunction and for damages.*— Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages. * * *"

nevertheless — of the right of a person to be let alone, a right directed ' against the commercial exploitation of one's personality.' '' (*Lahiri* v. *Daily Mirror, Inc.,* 162 Misc. 776, 779; Bohlen on Fifty Years of Torts, 50 Harv. L. Rev. 725, 731.) ] It made it a misdemeanor and a civil wrong for which exemplary damages and a preventive injunction might be obtained, to use the name, picture or portrait of any living person '' for advertising purposes or for the purposes of trade '' without first having obtained his written consent. | The remedy thus afforded was threefold: compensatory, punitive and preventive. Prior restraint was specifically authorized.

It should be noted that Warren and Brandeis in their article on '' The Right to Privacy '', recognized that there were certain clearly defined limitations to this right. They realized that the courts would have to endeavor to reach the point of equilibrium between the opposing tendencies, on the one hand, to protect '' the inviolate personality '', and on the other, to keep the avenues of news and of the dissemination of information free and unimpeded. '' The right to privacy '', they said, '' does not prohibit any publication of matter which is of public or general interest ''. (4 Harv. L. Rev. 193, 214.) They drew a distinction between those persons in whose private affairs the community has no legitimate concern and those who have renounced to live their lives screened from public observation and who are the subject of legitimate interest to their fellow citizens.

From the outset, the courts, in interpreting the '' Right of Privacy '' statute, took the position that it had no application to items of current news and that those who were the subject of news, whether public figures or otherwise, were not embraced in its provisions. The statute likewise has been held not to apply to articles which, though not strictly news, are informative and educational and which make use of the names or pictures of living persons. In this class of publications, however, the picture or name must be sufficiently relevant to the subject matter to warrant its use and must have some legitimate public interest; in other words, the use must be of such a nature as would not outrage common ordinary decency. The courts have tended to be extremely liberal, particularly as to publications in newspapers and magazines, in their conception of the scope of '' the dissemination of information ''. They have not, thus far at any rate, dogmatically applied the distinction laid down by Warren and Brandeis between a so-called private individual

and a public figure, although they have frequently emphasized the existence of the latter and given him a rather broad and elastic definition.

Many of the cases on this subject were considered and analyzed by this court in *Lahiri* v. *Daily Mirror, Inc.* (162 Misc. 776, 782, *supra*). It would serve no useful purpose to go into them here. Since that time, the most significant and far-reaching decision in this field was that in *Sidis* v. *F-R Pub. Corporation* (113 F. 2d 806). The *New Yorker* magazine, in 1937, in one of its " Profiles " published a biographical sketch of William Sidis, who in 1910 was a famous child prodigy. The Profile complained of described the early accomplishments of Sidis and his subsequent development over the years. While calling it a work of great reader interest CLARK, J., in his opinion described it as a " ruthless exposure of a once public character, who has since sought and has now been deprived of the seclusion of private life " (pp. 807–808). Sidis was held to have the status of " a public figure " and the article held to be within the scope of the legitimate dissemination of information on a matter of public interest.

The plaintiff in this case during the greater part of his life has been and continues to be an important public figure. His prominent achievements as a musician bring him constantly before the public eye and make his life of general interest. His stature as a conductor is amply attested by the numerous references to him in contemporary books, magazines and newspapers. He is well within the orbit of public interest and scrutiny.

Together with the removal of " current news " and matters of " public interest ", from the operation of the right of privacy statute there appeared in court decisions a realistic definition of the words " for advertising purposes, or for the purposes of trade " as used in the statute. A literal construction of these words would have resulted in seriously hampering freedom of speech and of the press. All publications presumably are operated for profit and articles contained therein are used with a view to increasing circulation. Accordingly, emphasis was laid on the nature of the article, and of the use of the name or picture, and whether they were of public interest, rather than on the element of profit.

It is clear, therefore, that the right of privacy statute applies to the unauthorized use of a name or picture to sell a collateral commodity. That was the precise situation presented in the

*Roberson* case (171 N. Y. 538, *supra*) and was what the statute was primarily intended to cover. (See *Rhodes* v. *Sperry & Hutchison Co.,* 193 N. Y. 223; *Eliot* v. *Jones,* 66 Misc. 95, affd. 140 App. Div. 911; *Neyland* v. *Home Pattern Co.,* 65 F. 2d 363.) The statute, it has been held, also applies to the unauthorized fictional use of a name or photograph (*Binns* v. *Vitagraph Co.,* 210 N. Y. 51; *Sidis* v. *F-R Pub. Corporation,* 34 F. Supp. 19, 24, affd. 113 F. 2d 806, certiorari denied, 311 U. S. 711, *supra*).

The right of privacy statute does not apply to an unauthorized biography of a public figure unless the biography is fictional or novelized in character. An examination of the book complained of clearly shows that it is not fictional. That it may contain untrue statements does not transform it into the class of fiction. (*d'Altomonte* v. *New York Herald Co.,* 208 N. Y. 596, modfg. 154 App. Div. 453, where the Court of Appeals found no cause of action stated under sections 50 and 51, although the story there attributed to the plaintiff had not been written by him and was false). Truth or falsity does not, of itself, determine whether the publication comes within the ban of sections 50 and 51. (Cf. Warren and Brandeis on The Right to Privacy, 4 Harv. L. Rev. 193, 218.)

The book we are considering deals almost entirely with the plaintiff's musical career. Very little is said about his private life. Indeed, the author suggests that Dr. Koussevitzky had room for nothing in his life but music and a devotion to his loyal wife and helpmate. Interspersed with the chronological narration of the facts are stories and comments in connection with the plaintiff's musical career, some avowedly apocryphal, others of doubtful reliability. Curiously enough, although there are many depreciatory statements, they seem to be invariably followed by ameliorative observations of unreserved praise. The factual matter contained in the book testifies to the plaintiff's triumphs as a conductor of the Boston Symphony and other great orchestras, to his courage and independence, and to his devotion to the education and training of young musicians. Most people know that a great conductor's work with his orchestra is not altogether carried on in an atmosphere of sweetness and light. The author evidently knows that too and loses no opportunity to inform his readers about it. In his final chapter, the author gives his personal estimate of the plaintiff's place in musical history and in sentence after sentence we find that depreciation and praise vie with each other for utterance.

There are statements in the book which the plaintiff might naturally find to be highly objectionable, if he is at all sensitive about those things. He may be able to prove some of them to be untrue and even defamatory. There are however no so-called revelations of any intimate details which would tend to outrage public tolerance. There is nothing repugnant to one's sense of decency or that takes the book out of the realm of the legitimate dissemination of information on a subject of general interest.

Since the biography does not fall within sections 50 and 51, neither do the advertisements or announcements thereof. Such advertising, as is here complained of, has been held to be incidental to the publication itself. (*Humiston* v. *Universal Film Manufacturing Co.*, 189 App. Div. 467, 477; *Sidis* v. *F-R Pub. Corporation*, 113 F. 2d 806, 810, *supra*.)

As for the use of the plaintiff's photographs, it has long been held that where one obtains a picture of a public person and there is no breach of contract or violation of confidence in the method by which it was obtained " he has the right to reproduce it, whether in a newspaper, magazine, or book. It would be extending this right of protection too far to say that the general public can be prohibited from knowing the public appearance of great public characters. Such characters may be said, of their own volition, to have dedicated to the public the right of any fair portraiture of themselves ". (*Corliss* v. *E. W. Walker Co.*, 64 F. 280, 282.) At least a question of fact is raised as to the lawful possession of these photographs. They are in no way objectionable in character and the opposing affidavits state that they were in the public domain.

The plaintiff contends that if it be held that the publication of this unauthorized biography is not a violation of his right to privacy under sections 50 and 51 of the Civil Rights Law, it nevertheless contains much defamatory matter, and he has grounds for injunctive relief against the further publication of a threatened libel affecting his professional status. Plaintiff urges that the defendants are financially irresponsible; that he has no adequate remedy at law; that the continued publication of the libelous statements contained in the book amounts to a tortious interference with his property interests, his earning power and his market for his proposed autobiography; and that he would be irreparably damaged unless he obtained injunctive relief.

The present law of this State, however, is conclusive to the effect that a court of equity will not restrain the publication of a libel even though the alleged wrongdoer may be financially irresponsible. This doctrine is very old, and it goes back, in this State, to the leading case of *Brandreth* v. *Lance* (8 Paige Ch. 24 [1839]). It has been criticized as archaic and outmoded; it results, it is urged, in a situation where a man's reputation lies at the mercy of the profligacy of others; that libelous imputations leave a stain which no after-repudiation can wipe out; and that " the traditional doctrine puts anyone's business at the mercy of any insolvent malicious defamer who has sufficient imagination to lay out a skillful campaign of extortion." (Pound on Equitable Relief Against Defamation and Injuries to Personality, 29 Harv. L. Rev. 640, 668.)

Whatever the basis of the ancient doctrine may have been — whether it originated from any valid, reasoned conviction or from historical accidents of practice and procedure — it is deeply ingrained in our law (*Advance Music Corp.* v. *American Tobacco Co.*, 268 App. Div. 707, 711, revd. on other grounds 296 N. Y. 79). True, there has been a tendency in other States, and in England, to depart from the application of the doctrine in its ancient rigor, in cases involving " disparagement of goods " or " trade libels " (see *Black & Yates* v. *Mahogany Assn.*, 129 F. 2d 227, certiorari denied 317 U. S. 672; *Menard* v. *Houle*, 298 Mass. 546; *Bonnard* v. *Perryman* [1891], 2 Ch. 269; *Collard* v. *Marshall*, [1892] 1 Ch. 571; *Thomas* v. *Williams*, 14 Ch. D. 864; *Loog* v. *Bean*, 26 Ch. D. 306). It does not, however, lie within the province of a court of original jurisdiction to declare the doctrine obsolete in this State or to modify or revise it.

Plaintiff must be left to his remedy at law for redress as to any matters contained in the book or the advertisements thereof which are shown to be libelous, but injunctive relief to prevent the publication of the volume, its advertisement or its further distribution may not be granted.

The application for an injunction *pendente lite* is accordingly in all respects denied, and the temporary stay is vacated. Settle order.