Peck, P. J.
(dissenting). As Justice Shientag and I are of the opinion that no cause of action for violation of section 51 of the Civil Rights Law is stated on the facts asserted by plaintiff, it is necessary for the statement of our dissent to set forth the facts fully.
The article complained of states that Valentine Lawless and plaintiff were coworkers in an office in Norfolk, Virginia. Plaintiff is described as- having been pretty and popular and Lawless as shy. “ Sometimes, perhaps he may have driven her home. Maybe an occasional lunch together, or a movie, or dancing. Nothing more.” The article goes on to say that Harold L. Sutton was a far more ardent suitor than Val Lawless had been and in the autumn of 1942 he and plaintiff became engaged; that they agreed that their marriage must wait until after the war because Harold expected to be drafted; that unexpectedly he was pronounced 4-F and that he and plaintiff were married and their first child was born two years later.
There is then an aside about the murder of plaintiff’s father and the trial of the murderer and his sentence in the local courthouse.
The article then continues:
“ On that day, in the same Norfolk courthouse — though she was not to learn of it until later — there were on file the legal *158 papers in a litigation which would make the name of Mildred Sutton one with those of Bury dice and Beatrice and Heloise and Roxanne and all the other heroines of fact and fable who have been loved, sometimes unknowingly, and lost. The will of Valentine BroAvne Lawless had been filed for probate.
“ Mildred had all but forgotten Val. She had learned of his death with sorroAv, as she had learned of the deaths of many other of her townsmen of her own generation, her schoolmates, boys she had known. That was all.
“ Val had not forgotten. Sometime, during one of those long hours of waiting that made up so much of war, he had written to a brother, Edward Lawless* Before that night over Linz, perhaps in a moment of prescience, Val had directed that the letter be opened only in the event of his death.
“In the letter, there were other directions. Mildred, Val wrote to Edward, was the only girl he had ever loved. If he died, Val Avrote, he wanted Mildred each week to have ‘ one perfect rose ’. He would leave a little money. He wanted Edward to see to it that Mildred received the weekly rose — from a donor who would remain forever anonymous.”
The article then recounts that Val’s will left the bulk of a $3,600 estate to his brother to apply it to a “ special purpose ”, that purpose being the letter bequest; that a will contest followed in which the letter had to be produced and plaintiff then learned of the bequest. It is stated that “ a settled young matron soon to be a mother for the second time, Mildred Sutton said only that she was deeply touched — but that she did not Avant the rose.” The article also states that the Virginia Supreme Court has the case on appeal, and concludes by saying that for several weeks past a Norfolk florist had been filling a weekly order for delivery to plaintiff. “ It may come from anywhere. But there it is, the order for delivery each week to Mildred Fitzpatrick Sutton; a rose red as the flames over Linz, red as the blood of heroes — ‘ one perfect rose.’ ”
The article is illustrated by a sketch of a turret gunner in a Flying Fortress with the legend “ It is now possible to guess Avhat the turret gunner of that B-17 was thinking in that flaming split-second over Linz, in Austria ”; and a sketch of a woman holding a rose and a photograph of plaintiff with the legend, “ For her, ‘ one perfect rose. ’ This is believed the only photo extant of Mrs. Mildred Sutton, exclusively published here.” A box in the upper corner of the page recites, “ Here, told for the first time in all its poignant and dramatic detail, is one of *159 the great true love stories of our time * * * A Flower a Week Forever for a Girl He Could Hot Have * * * with a surprise ending.” Across the top of the article, in simulated handwriting, are the words “ * * * to my only love * * * one perfect rose * *
The complaint, which is the subject of a motion to dismiss for insufficiency, alleges that the publication of the article was the use of plaintiff’s name and picture without her consent in connection with the business and trade of defendants. It alleges that the article was not in any way reporting current news but on the contrary was taking advantage of plaintiff’s name, photograph and private life to create for profit a dramatic story, fanciful and sensational in nature, designed primarily and exclusively for entertainment value. It charges that defendants made many untrue statements and drew many untrue and false and improper inferences and innuendoes through pictorial representation and otherwise and that the article was fictionalized.
Complaint is also made that the article was published in the magazine section in close association and consecutiveness to other sensational and lurid articles, tending to increase the sensational atmosphere of the article. It is further alleged that the illustrations were designed to dominate the story and did dominate the page, overshadowing the visual impression of the text, and that the illustrations purported to depict plaintiff tenderly holding a rose and created the impression that plaintiff actually accepted and cherished said rose as the rose sent by a former lover, who was not her husband, and had the effect of planting seeds of suspicion of the plaintiff in the mind of any person seeing such representation.
By reason of the premises, it is alleged plaintiff has been exposed to public ridicule and contempt, subjected to the taunts and gibes of acquaintances and others, has been greatly injured in her reputation and has suffered great bodily and mental anguish to her damage in the sum of $20,000, which is sought to bo recovered in addition to $100,000 as exemplary damages.
As the sufficiency of the complaint is the question, we might ordinarily be required to take the unspecified allegations of falsity and fiction at face value and rule that the action could not be disposed of on motion. In plaintiff’s brief, however, *‘ the true facts ” are set forth. We feel entitled therefore to judge the complaint in the light of the true facts as plaintiff claims or admits them to be. If we can see that upon those facts plaintiff would not be entitled to recover, a trial would be an idle cere *160 mony and waste of time and expense which we should not require or permit.
The ‘ ‘ true facts ’ ’ as stated by plaintiff are as follows: ‘ ‘ Mrs. Sutton, while unmarried, was known as Mildred Fitzpatrick. She was employed in a business office and one Yal Lawless was a co-worker. That was the only sense in which she was acquainted with him. She was never driven home by him. She did not have lunch with him at any time, go to a movie with him, or go dancing with him. She did not encourage his attentions or affections, nor could he be called a suitor. She married an engineer named Harold Sutton during the war. He was not classified as 4-F at any time, nor did the couple agree to wait until after the war for their wedding. She had completely forgotten Yal Lawless, as one would forget any co-worker after one left one’s job, or after the co-worker left his job. In fact she had never thought of him at any time except in the sense that she spoke to him during her employment, and during office hours. Yal Lawless perished in action. In the course of a controversy among the surviving brothers and sisters of' the deceased concerning the disposition of his estate, it transpired that he had attempted to designate the larger proportion of his means for the creation of a trust with his brother as trustee for the special purpose of sending one rose weekly to Mrs. Sutton.* Mrs. Sutton never wanted, received or accepted any such rose. She certainly never therefore held a rose in her hands which had been sent by Mr. Lawless [sic! request, or cherished any. At the time of the litigation in the Yirginia Court of Appeals. * * * the Mirror, along with other newspapers reported the court proceedings soberly in a news column.”
It can thus readily be seen that the article is basically true. The style of writing, the imaginative illustrations and the literary touches may have attracted and heightened the interest of the reader, but what was set forth was essentially no different or more dramatic or romantic than what actually inhered in *161 the facts and appeared in court records. While the article suggests that there may have been some occasional social association between the coworkers, it intimates nothing beyond the normal and proper. Far from indicating any romance between the plaintiff and Lawless, or any lingering memory of him on her part, it clearly states that there was none and that at the time of his death plaintiff had, as she says, forgotten him. Nor does the article intimate that plaintiff wanted or cherished the rose. On the contrary, it quotes plaintiff as saying that she did not want the rose. Indeed, we can see nothing in the article uncomplimentary to plaintiff or reflecting upon her in the least.
Of what can plaintiff complain, therefore, aside from unwanted publicity? Plaintiff acknowledges that a newspaper may give a factual report of newsworthy events, thereby making public matters which one involved would like to keep private". Plaintiff also concedes that truth or falsity themselves are not the gravamen of the action set forth in the complaint. Bather, it is stated, “ The falsity of these statements is not so much important in itself as it is to denote the fictionalization of the material, its dramatization and embroidery so as to take it out of the classification of honest reporting for the purpose of bringing to the public matters of legitimate concern ”.
We do not suppose that plaintiff would contend that the very unusual and humanly interesting event in which she figured was not newsworthy by accepted newspaper standards or a matter of legitimate reader concern. With any reporter alert to news in the vicinity publicity was inevitable. Plaintiff must rest therefore, as the cases hereafter reviewed indicate, on her allegation of fictionalization rather than on any subjective sensitivity to publicity. The adjectives used to characterize the article — dramatic, sensational, embroidered, embellished, fanciful, romantic — are degrees of damning not of a piece or all of legal relevance. That the article is dramatic, romantic or sensational is not of consequence if the content is truthful. Fictional or fanciful is quite different in connoting untruth, exploitation of plaintiff rather than exposition of news. Embroidered or embellished may be an innocent dressing up. They raise the question of whether some literary license is allowable in news-writing where news reporting is permissible.
“ The right of privacy ” is an inviting subject and one interesting to trace in legal development. Starting from nonexistence in a day when the law provided a remedy only for physical injury or damage to reputation by libel or slander, *162 some States have progressed by common law and others by statute to give some right and remedy to individuals for the invasion of privacy. The law of New York, prior to the enactment of sections 50 and 51 of the Civil Rights Law, denied recovery to a woman whose photograph was used without her permission in advertising defendant’s product (Roberson v. Rochester Folding Box Co., 171 N. Y. 538 [1902]).
The statute, while accepting and incorporating into the law the principle of privacy, is not as broad in its embrace as the champions of privacy or pioneers in that field would make it. (See Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 [1890]). The reach of the statute is limited to the use of a person’s name, portrait or picture for advertising or purposes of trade. The statute was born of an advertising case and its application is still confined to a commercial use or exploitation of a person’s name or picture.
The protagonists of privacy recognized that there is a public interest in the free dissemination of news and information. The individual always stands protected by the law of libel. His desire for privacy must yield, however, in the broad public interest in a free press, if he becomes newsworthy. While some of the cases refer to the object of the publicity as being a public figure, it is quite clear that being a public figure, whatever that may mean, is not the test of the publicity. If a person, although not through any choice of his own, becomes involved in the events of the day of public or human interest, the reporting of the happening and his involvement is a right of the press, and there is no right of the individual to be spared that publicity.
As the Court of Appeals said in Binns v. Vitagraph Co. (210 N. Y. 51, 56): “ It would not be within the evil sought to be remedied by that act to construe it so as to prohibit the use of the name, portrait or picture of a living person in truthfully recounting or portraying an actual current event as is commonly done in a single issue of a regular newspaper.”
While a newspaper is a commercial enterprise and its publication is for trade, items of news are not treated as trade. As contrasted with a motion picture dramatization involving repeated showings for the price of admission, the daily newspaper falls in a different class with a Avider leeway (Binns v. Vitagraph Co., supra).
The subject is reviewed and analyzed in Mr. Justice Shientag’s opinion at Special Term in the case of Lahiri v. Daily Mirror (162 Misc. 776). A picture of plaintiff was there *163 employed in illustrating an article which was not a news account but an article of human interest on the Hindu rope trick. From his consideration of the authorities, Mr. Justice Sheintag distilled certain rules, among which was a rule on the one hand that the use of a photograph in connection with an article of fiction is a violation of the statute, whereas the use of a photograph in connection with an article of current news is not, and that in between there are articles which are neither strictly news items nor strictly fictional in character which are educational and informative in nature and generally are not within the purview of the statute. Justice Shientag also observed what is applicable to the present case, and this we hold, that the applicability of the law is not dependent upon the position of the article in the newspaper, whether it appears in the news column, the educational section or the magazine section. It is the article itself and not its location and surroundings that is the determining factor.
Another case of importance in the law of privacy is Sidis v. F-B Publishing Corp. (113 F. 2d 806) in which the court held exempt from the statute a merciless discussion of the intimate details of plaintiff’s personal life, premised on the public interest in plaintiff, although at the time a recluse, because a quarter of a century earlier he had been a child prodigy. The New Yorker magazine, under the title “ Where Are They Now? ”, did a biographical sketch of plaintiff showing that the famous child of 1910, who at the age of eleven had been a lecturer on mathematics, had by 1937 become .an eccentric character in retirement. An article more offensive to the sensibilities of the subject could hardly be imagined, or one more violative of what Warren and Brandéis called “ inviolate personality.” (4 Harv. L. Rev. 205.) But the article, including advertising of it incorporating plaintiff’s name, was held not to be a violation of the New York statute. Said the Circuit Court of Appeals (p. 810): “ In this context, it is clear that ‘ for the purposes of trade 7 does not contemplate the publication of a newspaper, magazine, or book which imparts truthful news or other factual information to the public.”
While the plaintiff here properly places emphasis upon the words “ truthful news ” and “ factual information,” the law does not make absolute truth the test of whether an article violates the Civil Rights Law.
The alleged falsity of the account in parts was asserted as a ground for enjoining the publication of a biography in Kousse *164 vitsky v. Allen, Towne & Heath (188 Misc. 479, 484, affd. 272 App. Div. 759). The court there said: “ The right of privacy statute does not apply to an unauthorized biography of a public figure unless the biography is fictional or novelized in character. An examination of the book complained of clearly shows that it is not fictional. That it may contain untrue statements does not transform it into the class of fiction. (d’Altomonte v. New York Herald Co., 208 N. Y. 596, modfg. 154 App. Div. 453, where the Court of Appeals found no cause of action stated under sections 50 and 51, although the story there attributed to the plaintiff had not been written by him and was false).”
Further commenting upon the alleged falsity of some of the statements in the book, the court observed that there was nothing repugnant to one’s sense of decency or that took the book out of the realm of the legitimate dissemination of information on a subject of general interest.
This review of the authorities points the way in this case. The. fact that the article complained of is not strictly a news item or written in the conventional style of a news reporter, or that it is in the magazine section rather than the news columns, does not bring it within the purview of the Civil Eights Law and take it out of the proper realm of the press. The fact that some of the statements in the article may not be strictly factual does not destroy a press privilege which otherwise exists. The question is whether the account is fictional or novelized and whether if to some extent it varies from the truth the variance is repugnant to one’s sense of decency. We must take into account whether what is alleged to be the variance or literary embroidery is harmless in nature or whether it gives the article a character or impression out of line with the truth and is offensive.
Comparing the article in question with the truth, as admitted by plaintiff, we are unable to see that any liberties taken give any false impression or reflect upon the plaintiff. We find no material variance between the text of the article and the facts stated by plaintiff. It is essentially faithful to truth — fact not fable — and it might be said that the interest largely derives from the fact that it is truth stranger than fiction. The story is dramatic and romantic but that is because Lawless rather than the newswriter made it that way. The nonclassic style of narration, to which objection is taken, and the illustrations do not turn it into fiction or distort the truth or make it fanciful. The sketch of a woman holding a rose, on which plaintiff places so much emphasis in support of her contention that the article *165 depicts her as cherishing the rose of a former lover, is meaningless apart from the text of the article and, as we have observed, the text and article as a whole create no such impression but negative it. We cannot find the improper inferences and innuendoes of which plaintiff complains or that the style, as distinguished from the substance, or that the substance holds plaintiff up to ridicule and contempt or is uncomplimentary in any way.
Nor can we see that any issue is created by the allegation of the complaint that the article was designed for entertainment value and is hence “ trade ”. The privilege and latitude of the press in disseminating news cannot be made to depend upon or legality be tested by classifying news as informative, educational, amusing or entertaining, with the educational and informative given immunity and the amusing or entertaining classed as ‘ ‘ trade ”. No such well defined line can be drawn and, in application, no such division is practical or desirable. A newspaper is a composite of the educational, informative, amusing and entertaining, some of which would defy classification and much of which is combinative. News reports in the most conservative papers are frequently written in a light or amusing vein. The social columns are a parade of the personal for no higher purpose than show and satisfaction of the interest or curiosity which human beings have in the doings of others. The “ Believe It or Not ” stories of Ripley and other similar reporting of the strange, unusual or bizarre would be difficult to catalogue, but are more amusing than educational, and are an acceptable part of any newspaper. The articles held to fall within the protection of press privilege in the Lahiri and Sidis cases {supra) were more amusing and entertaining in character than informative or educational. The public interest would not be served or the application of the Civil Rights Law facilitated by evaluating news articles as educational, informative or amusing. The test, so far as this case is concerned, must therefore rest on the tendered issue of truth or fiction.
Nor can differences in taste be raised into an issue. Decency may be so offended as to become a consideration in determining the legitimacy of publishing news, but as Warren and Brandeis said ‘£ it is only the more flagrant breaches of decency and propriety that could in practice be reached, and it is not perhaps desirable even to attempt to repress everything which the nicest taste and keenest sense of the respect due to private life would condemn.” (4 Harv. L. Rev. 216.)
*166 It is not for court or jury in a case of this kind to appraise the quality or taste of a presentation. Clearly, bounds of decency were not exceeded, so the contention of plaintiff resolves itself, as it must, into the argument that a fictional and false impression was given of her. It is on that issue which the case must be decided and to our minds a comparison of the article with the asserted and admitted facts compels the conclusion that the story is not fictionalized or rendered to give any false impression or reflect upon plaintiff.
The learned court at Special Term thought, and the majority of the court here agree, that a jury might find that the article went beyond the scope of immunity pertaining to the publication of news. It is appropriate to judge this case from that viewpoint.
The scope of immunity is a question of law. If there were some factual question underlying the determination of immunity or room for a jury judgment, we would agree that the case should stand trial. But if upon the admitted facts we would finally be obliged to rule that no cause of action is made out and would be obliged to set aside any verdict which a jury might render in favor of the plaintiff, there is no jury question and we would not be justified in allowing the case to go to trial. Indeed, we do not see how a question would be framed for the jury in this case or how they could be instructed on the law to leave any question for them. Taking the facts as presented by plaintiff, we hold the view as a matter of law that a violation of the Civil Rights Law is not made out. In our opinion the order appealed from should be reversed, and the complaint dismissed.
(xlennon and Cohn, JJ., concur with Dore, J.; Peck, P. J., dissents and votes to reverse and dismiss the complaint in an opinion in which Shientag, J., concurs.
Order affirmed, with $20 costs and disbursements to the respondent.

 It appears from Lawless v. Lawless (187 Va. 511, 516) that Lawless left a will bequeathing his property to his brother to be used for the purposes set forth in a letter which was filed as a part of the record in the court proceeding. The letter directed the brother to make a contract with a florist to send one rose each Saturday morning to the residence of plaintiff, “ a girl whom I have loved very dearly for over three years at this writing, and shall continue to love for the duration of my life. * * * and I want the one perfect rose- of any color (to vary) to he sent to her * * Both from the date of the will and letter and reference to plaintiff by her maiden name it is clear that the bequest was made by Lawless before and without knowledge of her marriage.