Vah Voorhis, J.
This action to recover damages for alleged violation of plaintiff’s right to privacy, based on sections 50 *168 and 51 of the Civil Rights Law, arises from the tragic accident on July 28, 1945, when a United States Army bombing plane crashed into the Empire State Building in New York City. All of the occupants of the plane were killed. It struck the building at the 79th floor, and the force of the impact, several explosions, and the flaming gasoline severely burned and maimed many people in offices upon that and neighboring floors.. One elevator fell to the ground floor, injuring the girl who ran it, and all of the elevators temporarily were prevented from operating. This spectacular catastrophe, following soon after V-E Day, was widely publicized throughout the United States. It caught the imagination of the American people, illustrating, perhaps, on a small scale, what might be expected if any of our large cities were to be subjected to enemy attacks from the air.
Plaintiff was the most celebrated hero of the occasion. A seventeen-year-old assistant pharmacist’s mate in the United States Coast Guard, he displayed exceptional presence of mind in quickly procuring medical equipment, and in evacuating a large number of victims, to many of whom he administered first aid. For his conduct he was awarded the Medal of Valor by the American Legion, under authority of the Congress of the United States.
At once plaintiff became a national figure in connection with this incident. The record shows that he was featured in the New York Journal-American, New York Times, New York Herald-Tribune, Daily Mirror and Sunday Mirror, in New York City, and that newsreel motion pictures and newspaper photographs were taken of him, which were reproduced in newspapers and magazines throughout the country.
This action springs from an account of this incident with accompanying drawings, which appeared some six months later in a magazine published by defendant, entitled “ Boy Comics ”. It occupies five pages of an issue containing various series of pictures, and is headed “ The True Story of the Empire State Building ”, beneath which are the capitalized words “ REAL HERO ”, The script is taken almost verbatim from the news account as it appeared in the Neiv York Journal-American. The pictures are not actual photographs, but the usual type of drawings or symbolic sketches which are found in such publications. The first pictures are of a four-motored bombing plane crashing into the Empire State Building, followed by an illustrated narrative of plaintiff’s deeds. He is shown procuring morphine, hypodermics, and first-aid kits from a drugstore, giving first aid to an elevator girl who sustained severe burns *169 and had descended rapidly from the 79th floor, then shown climbing the stairs to the 79th floor while the elevators were disabled, and then carrying out survivors and again administering first aid. The narrative culminates in plaintiff’s being congratulated by survivors and photographed and interviewed by newsmen and, finally, in his being recommended by the Coast Guard for a decoration.
The history of sections 50 and 51 of the Civil Rights Law is so well understood that it is hardly necessary to review it. In this State there is no common-law right to privacy (Roberson v. Rochester Folding Box Co., 171 N. Y. 538). As a result of that decision, these sections were added to the Civil Rights Law. Their constitutionality was upheld in Rhodes v. Sperry & Hutchinson Co. (193 N. Y. 223, affd. sub nom. Sperry & Hutchinson Co. v. Rhodes, 220 U. S. 502). They forbid use of the name, portrait or picture of a living person, without his consent, “ for advertising purposes, or for the purposes of trade The cases construing this legislation are reviewed in an opinion by Justice Shientag in Lahiri v. Daily Mirror (162 Misc. 776) which contains an analysis of the subject that has become the basis for most subsequent decisions. It is stated in Justice Shientag’s opinion (p. 782):
“ The rules applicable to unauthorized publication of photographs in a single issue of a newspaper may be summarized generally as follows:
“ 1. Recovery may be had under the statute if the photograph is published in or as part of an advertisement, or for advertising purposes.
1 ‘ 2. The statute is violated if the photograph is used in connection with an article of fiction in any part of the newspaper.
‘ ‘ 3. There may be no recovery under the statute for publication of a photograph in connection with an article of current news or immediate public interest.
“ 4. Newspapers publish articles which are neither strictly news items nor strictly fictional in character. They are not the responses to an event of peculiarly immediate interest but, though based on fact, are used to satisfy an ever-present educational need. Such articles include, among others, travel stories, stories of distant places, tales of historic personages and events, the reproduction of items of past news, and surveys of social conditions. These are articles educational and informative in character. As a general rule, such cases are not within the purview of the statute.
*170 “ The rules set forth apply regardless of the position of the article in the newspaper, whether it appears in the news columns, the educational section or the magazine section. It is the article itself rather than its location that is the determining factor.”
These classifications apply, with some possible distinctions, to books and magazines. It is well settled that the right of privacy does not prohibit the publication of matter which is of legitimate public or general interest, although no longer current. An illustration of this is the case of Sidis v. F-R Publishing Corp. (113 F. 2d 806), which was decided under the same statutes by the United States Circuit Court of Appeals in the Second Circuit. The plaintiff in that case, in 1910, had been a child prodigy who graduated from Harvard at the age of sixteen, amid considerable public attention. After that he shunned publicity, but became the unwilling subject of a biographical sketch and lampoon printed in the August 14, 1937, issue of the weekly magazine known as The New Yorker. Although the article was not degrading, it was a pitiless exposé of the failure of this man to realize the great promise of his youth. Sidis was regarded as a public figure on account of having been a distinguished child prodigy, which was held to justify an invasion of his privacy years later in order to satisfy legitimate public curiosity or interest in his subsequent career. It is said in the opinion: “ Regrettably or not, the misfortunes and frailties of neighbors and ‘ public figures ’ are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day.”
Defendant herein appeals from plaintiff’s judgment against it upon the ground that the account in its magazine was a true narration of an event of general interest, in which plaintiff had been widely and prominently featured in the public press. The principal question in this case arises over whether plaintiff is entitled to invoke sections 50 and 51 of the Civil Rights Law, on the ground that defendant has embroidered this event by fiction, with the consequence that it is neither an article of current news, educational in character, nor a subject of legitimate public interest. Defendant-appellant counters with the position that comic strips have become a medium of expression not only in fiction, but also in the factual exposition of current events and other subjects of general interest or entertainment. In. order to escape sections 50 and 51 of the Civil Rights Law, a factual presentation need not be educational, even if it does not pertain *171 strictly to current news. Such subjects as cartoons, Believe-it- or-not Ripley, gossip and social columns, are not chiefly educative in character, yet, if about persons in the limelight, they are not likely to be actionable if the facts stated are true and if the comment is fair (Elmhurst v. Pearson, 153 F. 2d 467). Moving pictures, such as the March of Time, are not prohibited under ordinary circumstances, merely for the reason that, to some extent, persons are impersonated who are in the public eye, and the events dramatized. The line of demarcation between informing and entertaining has been said to be too elusive to serve as a guide for the protection of the basic right of freedom of the press (Winters v. New York, 333 U. S. 507).
We think that this article is not to be classed as fictional merely for the reason that it is presented pictorially, by a schematic representation of the events depicted in the form of rough sketches which do not purport to be exact replicas of the original subjects. Comic strips are, to some extent, a throwback to the origin of language, typified by the word 1 ‘ hieroglyph ’ ’, which refers primarily to the picture-writing of the ancient Egyptians, or the figure-writing of the Chinese, Aztecs and ancient Peruvians (Funk & Wagnalls New Standard Dictionary). If such a form of expression appeals to immaturity, it may hark back to the childhood of civilization, but one may think that it is nonetheless a medium of expression akin to language, and capable of being employed for the same varied uses. It does not follow that plaintiff’s exploit has been fictionalized merely for the reason that it has been told through a form of picture-writing, which is as old as the human race.
Neither does defendant’s article become fictional due merely to the circumstance that the incident is described in a magazine containing other articles, presented through the same medium, that are of a fictional nature. That is true of most magazines, which contain short or serial stories interspersed with other kinds of articles. As was said by Justice Shiehtag in the Lahiri case (162 Misc. 776, 782), “ It is the article itself rather than its location that is the determining factor.”
There is nothing libelous concerning plaintiff in this publication; on the contrary, what he did is praised.
The burden of proof is upon plaintiff to establish his cause of action, which means that it is incumbent upon him to show that the article is based on fiction rather than fact. Plaintiff’s counsel has argued that there is no evidence of the accuracy of the newspaper account in the New York Journal-American, which corresponds to the script and narrative sequence of *172 defendant’s article. Nevertheless it was plaintiff’s duty to indicate in what respects defendant’s version of the event varies from what occurred. Only in minor particulars has plaintiff shown inaccuracy, his main contention being that he has necessarily been used as a character in fiction by being placed in a book of comics under any circumstances. This argument is not so clear as to justify the ruling of the trial court that publication of defendant’s account of plaintiff’s acts was for purposes of trade. Comic strips have their devotees and their denouncers. The taste or moral tone of the other articles in the book, however important in itself, is not material to this issue, since plaintiff has not sued for defamation. Whether his reputation has been enhanced or degraded does not relate to whether he has been fictionalized, which determines whether his statutory right of privacy has been invaded. All newspapers and magazines are published for profit; that is not the criterion of the uses of trade under section 50 (Koussevitzhy v. Allen, Towne & Heath, 188 Misc. 479, affd. 272 App. Div. 759). Neither are we concerned here with the exploitation of a person’s frailties or idiosyncracies for profit.
In one of the pictures of plaintiff, to be sure, the chevrons upon his United States Coast Guard uniform are at an angle corresponding to that of the insignia of the Spars or Waves, but there is nothing effeminate about the drawings, which represent plaintiff as a man in the regular male Coast Guard uniform. In one picture he is shown carrying two women out of an office in the building at the same time whereas, in fact, he carried to safety a number of women one at a time. It was stated that he climbed the stairway to the 79th floor, where the accident occurred, whereas he ran up about 70 floors. These are minor errors, which may have caused some good-natured banter among plaintiff’s shipmates (who would have been likely to have done so anyhow in view of the sensational nature of the regular newspaper articles), but do not destroy the essential accuracy of defendant’s presentation (Koussevitzhy v. Allen, Towne & Heath, supra).
The leading case on which plaintiff relies, and which undoubtedly caused the trial court to rule that publication of defendant’s article without plaintiff’s consent was “ for purposes of trade and profit and constitutes a violation of section 50 of the Civil Rights Law ”, is Binns v. Vitagraph Co. (210 N. Y. 51). That action concerned the first widely publicized rescue at sea through the use of wireless telegraphy, occasioned by a collision in 1909 between the steamships Republic and *173 Florida. Mr. Binns was a wireless operator on the Republic, and became a celebrated figure. After rejecting several monetary offers to appear upon the stage or in the movies on account of that incident, Mr. Binns justly felt aggrieved at being impersonated without his consent in a scenario produced by defendant. It contained five series of pictures, the last of which was purely fictional and introduced by the announcement ‘ ‘ Jack Binns and his Good American Smile ”. (P. 53.) A stolid Englishman, he testified upon cross-examination that his smile was for his friends and immediate associates and not for the public. The smile in the scenario was not his, in any event, but that of the actor by whom he was impersonated. Concerning this final series, it was stated on page 26 of the brief for Binns in the Court of Appeals: “ Respondent does not appear therein as taking part in a current event, or any event whatever. He is depicted smiling, winking and contorting his face solely for the amusement of the spectators. As to that particular series of pictures, the most obnoxious of them all, there can be no valid claim by the appellant of its right to use it on the ground that it is telling the story of the happening of a current event by means of pictures instead of by words and there can be no dispute that the statute applies.”
It would appear to be concerning this part of the scenario that the Court of Appeals said (p. 58): “By such pictures an audience would be amused and the maker of the films and the exhibitors would be enriched. The greater the exaggeration in such a series of pictures, so long as they were not libelous, the greater would be the profit of the picture-maker and exhibitor.”
This feature of the Binns case, acknowledged by his counsel to have been the most important, is absent from the present action.. Plaintiff herein was not impersonated. There is no pretense that the drawings are photographic likenesses, nor that they are more than an aid in recounting the incident. There is no departure from the narrative to introduce the reader to the imaginary personal life or characteristics of plaintiff.
In the Binns case it was stated that the statute is penal and should be strictly construed. Since its decision in 1913, it has been distinguished frequently, and confined to its particular facts (e.g., Toscani v. Hersey, 271 App. Div. 445, 447, et seq.; Humiston v. Universal Film Mfg. Co., 189 App. Div. 467, 473; Levey v. Warner Bros. Pictures, 57 F. Supp. 40, 42; Sidis v. F-R Publishing Corp., 113 F. 2d 806, 811, supra; Freed v. Loew’s, *174 Inc., 175 Misc. 616, 617; Lahiri v. Daily Mirror, 162 Misc. 776. 782, supra; Koussevitsky v. Allen, Towne & Heath, 188 Misc. 479, supra).
The judgment appealed from should be reversed and the complaint dismissed, with costs.